# Supreme Court of Florida

_____

No. SC11-2320

_____

**INTERVEST CONSTRUCTION OF JAX, INC., et al.,**
Appellant,

vs.

**GENERAL FIDELITY INSURANCE COMPANY,**
Appellee.

[February 6, 2014]

QUINCE, J.

This case is before the Court for review of two questions of Florida law certified by the United States Court of Appeals for the Eleventh Circuit that are determinative of a cause pending in that court and for which there appears to be no controlling precedent. We have jurisdiction. See art. V, § 3(b)(6), Fla. Const. For the reasons that follow, we hold that the insured in this case can use the payments to it from a third party to satisfy the self-insured retention provision.

**FACTUAL AND PROCEDURAL HISTORY**

This case involves the terms of a general liability insurance contract entered into by General Fidelity Insurance Company (General Fidelity) with Intervest Construction of Jax, Inc., and ICI Homes, Inc. (ICI). The dispute arose out of a personal injury lawsuit filed against ICI by an injured homeowner.

In 2000, ICI contracted with Custom Cutting, Inc. (Custom Cutting) to provide trim work, including installation of attic stairs in a residence that ICI was in the process of building. The contract between Custom Cutting and ICI contained an indemnification provision requiring Custom Cutting to indemnify ICI for any damages resulting from Custom Cutting's negligence. In April 2007, Katherine Ferrin, the owner of a residence constructed by ICI, fell while using the attic stairs installed by Custom Cutting. This fall resulted in serious injuries to Ferrin. Ferrin filed suit against ICI for her injuries; she did not file suit against Custom Cutting. In turn, ICI sought indemnification from Custom Cutting under the terms of the subcontract.

At the time of the accident, Custom Cutting maintained a commercial general liability insurance policy with North Pointe Insurance Company (North Pointe). ICI was not an additional insured under Custom Cutting's policy with North Pointe. ICI held the General Fidelity policy at the time of the accident. Contained in the General Fidelity policy was a Self–Insured Retention endorsement ("SIR") in the amount of $1 million. The SIR endorsement stated

that General Fidelity would provide coverage only after the insured had exhausted the $1 million SIR. The policy also included a transfer of rights clause granting the insurer some subrogation rights, the extent to which the parties dispute.

ICI, Custom Cutting, North Pointe, General Fidelity, and Ferrin participated in a mediation of Ferrin's claim. At the mediation, the parties agreed to a $1.6 million settlement of Ferrin's claim. As part of the settlement, North Pointe agreed to pay ICI $1 million to settle ICI's indemnification claim against Custom Cutting. ICI, in turn, would pay that $1 million to Ferrin. The instant dispute then arose as to whether ICI or General Fidelity was responsible for paying Ferrin the remaining $600,000.

Because of the disagreement between General Fidelity and ICI over coverage, North Pointe paid the $1 million into the trust account of ICI's counsel and each party reserved all rights and claims against the other. Approximately one month later, both ICI and General Fidelity each paid $300,000 to Ferrin, in addition to the $1 million from North Pointe, in order to settle Ferrin's claim for the full $1.6 million. However, the parties reserved the right to bring their claims against each other in order to be reimbursed for their contribution to the settlement.

ICI filed suit in the Circuit Court of the Fourth Judicial Circuit, in and for Duval County, Florida for breach of contract and a declaratory judgment seeking return of the $300,000 ICI paid above the $1 million indemnification payment and

for attorneys' fees and costs incurred in the Ferrin lawsuit. General Fidelity then removed the case to the United States District Court for the Middle District of Florida based on diversity jurisdiction. General Fidelity filed a counterclaim seeking return of the $300,000 it had paid to Ferrin. The parties filed cross-motions for summary judgment.

In its complaint, ICI alleged that General Fidelity failed to perform its obligation under the policy by refusing to pay $600,000 of the $1.6 million settlement. ICI maintained that Custom Cutting/North Pointe's contribution of $1 million to settle ICI's indemnification claim, which was then passed on to Ferrin, satisfied the SIR obligation in the policy and General Fidelity was required to pay the remaining $600,000. General Fidelity argued that North Pointe's $1 million payment to settle the indemnity claim did not reduce the SIR because the payment originated from Custom Cutting, not ICI. Thus, General Fidelity maintained that the terms of the policy required ICI to pay the additional $600,000 to settle Ferrin's claim.

The district court denied ICI's motion for summary judgment but granted General Fidelity's motion, holding that ICI could not use the $1 million indemnification payment to satisfy the SIR. The district court cited four California cases addressing similar SIR provisions in insurance policies. Based on the reasoning in those California cases, the district court concluded that the language

in the SIR provision at issue in this case is unambiguous because it provides that the "Retained Limit" must be paid by the insured and that the "Retained Limit" will only be reduced by payments made by the insured. Thus the district court found that the indemnity payment that ICI received from Custom Cutting did not exhaust the SIR obligation as required by the language of the policy. Additionally, the district court found that even if ICI had paid the $1 million out of pocket, General Fidelity had paid out the additional $600,000, and ICI was indemnified by Custom Cutting at a later date, ICI would still not have exhausted the SIR as required by the policy because the "transfer of rights" provision in section IV(8) of the policy provides that if the insured has rights to recover all or part of any payment that the insurer has made, those rights are transferred to the insurer. Accordingly, the district court entered judgment in favor of General Fidelity for $300,000.

ICI appealed the district court's ruling to the Eleventh Circuit Court of Appeals. The Eleventh Circuit identified two issues that governed the outcome of the case, but concluded there was no controlling Florida law on either issue. Unlike the district court, the Eleventh Circuit did not find the California cases persuasive in interpreting the General Fidelity policy because the California policies were materially different. Thus, the Eleventh Circuit certified two questions to this Court for resolution:

1. DOES THE GENERAL FIDELITY POLICY ALLOW THE INSURED TO APPLY INDEMNIFICATION PAYMENTS RECEIVED FROM A THIRD-PARTY TOWARDS SATISFACTION OF ITS $1 MILLION SELF-INSURED RETENTION?

2. ASSUMING THAT FUNDS RECEIVED THROUGH AN INDEMNIFICATION CLAUSE CAN BE USED TO OFFSET THE SELF-INSURED RETENTION, DOES THE TRANSFER OF RIGHTS PROVISION FOUND IN THE GENERAL FIDELITY POLICY GRANT SUPERIOR RIGHTS TO BE MADE WHOLE TO THE INSURED OR TO THE INSURER?

Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co., 662 F.3d 1328, 1332-33 (11th Cir. 2011). We address each question in turn below.

**ANALYSIS**

Under Florida law, the interpretation of insurance contracts, such as the commercial general liability policy in this case, is governed by generally accepted rules of construction. U.S. Fire Ins. Co. v. J.S.U.B., Inc., 979 So. 2d 871, 877 (Fla. 2007). "Insurance contracts are construed according to their plain meaning. Ambiguities are construed against the insurer and in favor of coverage." Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co., 913 So. 2d 528, 532 (Fla. 2005). However, courts only look to the rules of construction "when a genuine inconsistency, uncertainty, or ambiguity in meaning remains after resort to the ordinary rules of construction." Id. (quoting State Farm Mut. Auto. Ins. Co. v. Pridgen, 498 So. 2d 1245, 1248 (Fla. 1986)). Courts may not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the

- 6 -

intentions of the parties." Id. (quoting Pridgen, 498 So. 2d at 1248). Further, "in construing insurance policies, courts should read each policy as a whole, endeavoring to give every provision its full meaning and operative effect." J.S.U.B., 979 So. 2d at 877 (quoting Auto-Owners Ins. Co. v. Anderson, 756 So. 2d 29, 34 (Fla. 2000)). "Although exclusionary clauses cannot be relied upon to create coverage, principles governing the construction of insurance contracts dictate that when construing an insurance policy to determine coverage the pertinent provisions should be read in pari materia." Id. (quoting State Farm Fire & Cas. Co. v. CTC Dev. Corp., 720 So. 2d 1072, 1074-75 (Fla. 1998)).

The text of the SIR endorsement in the instant case provides, in pertinent part:

**THIS ENDORSEMENT CHANGES THE POLICY.**
**PLEASE READ IT CAREFULLY**

**SELF-INSURED RETENTION**
**Per Occurrence**

**Self-Insured Retention: $1,000,000 Per Occurrence**
**Including Loss Adjustment Expense**

In consideration of the premium charged, it is agreed the insurance afforded by the policy to which this endorsement is attached is subject to the following additional terms, conditions and provisions. In the event of a conflict between any of the terms, conditions or provisions of the policy and this endorsement, this endorsement will control the application of insurance to which the policy applies.

Unless otherwise specified, all terms used in this endorsement have the meaning set forth in the policy.

1. The Self-Insured Retention, shown above, applies to each and every "occurrence" or offense made against any insured, to which this insurance applies, irrespective of the number of claims which may be joined in to any one "suit" or claim.

2. Our total liability will not exceed the Limits of Insurance as specified in the policy Declarations, Coverage Parts or endorsements. The Limits of Insurance will apply only in excess of the Self-Insured Retention, hereinafter referred to as the "Retained Limit."

3. We have no duty to defend or indemnify unless and until the amount of the "Retained Limit" is exhausted by payment of settlements, judgments, or "Claims Expense" <u>by you</u>.

. . . .

5. Should any claim arising under this policy result in a settlement or judgment, including "Claims Expense" incurred by the insured or on the insured's behalf, in excess of the "Retained Limit," we will pay those amounts in excess of the "Retained Limit" to which this insurance applies subject to the Limits of Insurance as specified in the Declarations.

6. The "Retained Limit" will <u>only</u> be reduced by payments made <u>by the insured</u>.

. . . .

11. With respect to any claim payable under this insurance and subject in whole or in part to the "Retained Limit" as provided in this endorsement, we will have the right, but not the obligation to assume the control of said claim and to pay any part of or all of the amount of any such loss including "Claims Expense" within the "Retained Limit" on behalf of and for the account of the insured to affect settlement of said claim. Amounts paid by us pursuant to this paragraph will be reimbursed to us by the insured within ten (10) days from the date of our written request to the insured. We will have the right to make partial recoveries from the insured when partial

settlements or "Claims Expense" are incurred by us within the "Retained Limit" as provided by this endorsement.

. . . .

14. The insolvency, bankruptcy, receivership of the insured, or any refusal by or inability of the insured to satisfy its obligations pursuant to this endorsement will not reduce the "Retained Limit" as set forth in the endorsement, nor will it require us to pay any amounts within the "Retained Limit." The payment of the "Retained limits" <u>by the insured</u> is a condition precedent for our obligation to pay any sums either in defense or indemnity and we shall not pay any such sums until and unless the insured has satisfied its "Retained limits."

The underlined portions of the endorsement were cited by the district court as unambiguously requiring the insured to pay the "Retained Limit" from his or her own funds.

Both parties filed motions for summary judgment on the issue of whether ICI's self-insured retention obligation was exhausted by an indemnification made by one of its subcontractors. The district court denied ICI's motion and granted General Fidelity's motion, entering judgment in its favor for $300,000. <u>Intervest Constr. of Jax, Inc. v. Gen. Fid. Ins. Co.</u>, Case No. 3:09-cv-00894-HES-JRK (M.D. Fla. Apr. 22, 2010). The district court recognized that no Florida law addressed this narrow issue and cited three California decisions as persuasive authority. <u>Id.</u> at 6. The cited cases included <u>Vons Cos. v. United States Fire Insurance Co.</u>, 92 Cal. Rptr. 2d 597 (Ct. App. 2000), <u>Travelers Indemnity Co. v. Arena Group 2000, L.P.</u>, 2007 WL 935611 (S.D. Cal. Mar. 8, 2007), and <u>Forecast Homes, Inc. v. Steadfast</u>

Insurance Co., 105 Cal. Rptr. 3d 200 (Ct. App. 2010). The district court briefly summarized the reasoning in the cases and noted that "the instant case does not fall directly in line with any of the policy language discussed" in these cases. Intervest Constr., Case No. 3:09-cv-00894-HES-JRK , slip op. at 8. However, the district court found that the SIR endorsement in the policy repeatedly stated that the retained limit must be paid by the insured and that the limit would only be reduced by payments made by the insured. The district court found these terms to be unambiguous and required ICI to exhaust the SIR by payment of its own funds, not by application of the indemnification funds. Id.

On appeal, the Eleventh Circuit stated that the crux of the dispute between the parties focuses on two provisions of the General Fidelity policy, the SIR endorsement and the transfer of rights clause.[1] Intervest Constr., 662 F.3d at 1329. The Eleventh Circuit noted that the particular language at issue in the General Fidelity policy is different from the language in the California cases.[2] Id. at 1330.

---

1. The transfer of rights clause is set forth and addressed in the analysis of the second certified question below.

2. The Eleventh Circuit also cited a fourth California case as being materially different from the instant case. The Eleventh Circuit noted in a footnote that the SIR endorsement at issue in Insurance Co. of the State of Pennsylvania v. Acceptance Insurance Co., 2002 WL 32515066 (C.D. Cal. Apr. 29, 2002), contained a provision expressly addressing the possibility that the insured had other insurance covering the same claims.

- 10 -

The Eleventh Circuit considered these distinctions to be "potentially significant" and found the policies in the California cases to be "materially different for two reasons: (1) the General Fidelity Policy, unlike those policies examined by other courts, does not contain an explicit provision addressing the precise issue in question, and (2) the language of the General Fidelity Policy is arguably less restrictive than the language of the policies at issue in those cases." Id. (footnotes omitted). The Eleventh Circuit explained that "[r]equiring that a payment be made from one's 'own account' is not necessarily the same as requiring that the retained limit be paid 'by you'." Id. In fact, the Eleventh Circuit reasoned that "a strong argument could be made that ICI exhausted its SIR because it paid for the protection afforded in the indemnification clause; to wit, ICI paid for that indemnity protection in the purchase price of the Custom Cutting subcontract and therefore hedged its retained risk, just as it could have paid for a loan or paid a premium on an insurance policy." Id. Thus the Eleventh Circuit expressed skepticism of the district court's analysis of this issue of Florida law. Id. at 1330-31. The Eleventh Circuit also noted that the policy at issue here "appears on its face to be more permissive" than those in the California cases because it did not contain any other provision requiring payments directly from the insured's own account or expressly prohibiting the use of indemnification payments to satisfy the SIR. Id. at 1331.

- 11 -

Although each of the California cases cited by the district court and the Eleventh Circuit addressed the satisfaction of a SIR obligation, none involved the same policy language at issue here. What the cases have in common with each other, and with the resolution of the instant case, is that the policy language controlled—because it either clearly addressed or was ambiguous on the issue of how or by whom the SIR could be paid.

Vons involved an issue similar to the one presented here. A person was injured by a pallet jack being operated by a Vons employee in the common area of a shopping center owned by Vons' landlord, Longs Drug Stores (Longs). Vons, 92 Cal. Rptr. 2d at 599. The victim sued Vons for his injuries. Vons in turn cross-complained against Longs, alleging that Longs had expressly agreed to indemnify Vons for injuries that occurred in the common area and that Longs was partially to blame for the accident. Id. As part of Vons' lease agreement with Longs, Vons was named an additional insured under Longs' comprehensive general liability (CGL) insurance policy. The insurance policy contained a SIR endorsement, but it had been exhausted at the time the injured man filed his complaint. Thus the insurance policy provided first dollar coverage for the victim's injuries. Id.

Vons was also insured under its own CGL policy issued by U.S. Fire. The Vons policy provided $1 million in coverage, but also included a $1 million SIR endorsement. The SIR endorsement in the Vons policy also provided that it was

- 12 -

"subject to the limits of liability, exclusions, conditions, and other terms of the policy to which this agreement is attached . . ." and that "all other terms and conditions of this Policy remain unchanged." Id. Longs' insurer issued a $1 million check to Vons as an additional insured under the Longs policy; Vons contributed $539,905 of its own funds to pay all of the settlement to the injured man. Vons and U.S. Fire disagreed on whether the $1 million SIR in the Vons policy would be deemed exhausted if that sum were paid on behalf of Vons as an additional insured under the Longs policy.

Vons sued U.S. Fire for declaratory relief on the issue. The trial court ruled that U.S. Fire had to reimburse Vons the $539,905 contributed to the settlement. The trial court determined that the Vons policy did not limit the source of the $1 million SIR in any way and did not require Vons to pay the SIR exclusively from its own pocket. Id. at 600. U.S. Fire appealed to the California appellate court, which concluded that the "subject to" language in the SIR endorsement made the endorsement subordinate to the other policy terms and conditions, including the "other insurance" provision that made the insurance excess in the event that other insurance was available. Id. at 604-05. The court explained that the SIR standing alone would ordinarily make the Vons policy excess, but this provision was expressly made subject to policy terms which also provided that U.S. Fire's coverage was excess if any other valid insurance were available for the same

- 13 -

coverage.  The appellate court concluded that the most reasonable construction of this provision permitted the payment of the SIR amount through other valid and collectible insurance.  Id. at 605.  At the very least, the court stated, it rendered the SIR ambiguous on this point.  Id.  As the appellate court explained:

> Nowhere does the SIR expressly state that Vons itself, not other insurers, must pay the SIR amount.  Because the SIR was subject to the other insurance provisions, which also made the Vons policy excess if there were another policy covering the accident, Vons as a reasonable insured could read the policy as permitting the use of other insurance proceeds to cover the SIR amount.

Id.

Another case which involved the question of whether a policy required the SIR to be paid from the insured's own account is Arena Group.  The underlying action involved personal injuries sustained when a two-ton marquee sign at the San Diego Sports Arena fell on two individuals.  Arena Group, 2007 WL 935611, at *1.  The Arena Group was an additional insured under a policy that included a SIR of $500,000.  The court noted that "a policy may prohibit the use of other insurance to satisfy a retention by including a policy provision requiring the insured to personally pay the retained amount."  Id. at *5.  The court focused on the language of the policy, which stated, "Insured shall pay from its own account all amounts within the Retained Amount" and "The Retained Amount is the responsibility of the Insured and is to be paid from the Insured's own account."  Id. Thus, the court concluded, the policy "unambiguously requires the Insured to pay

the Retained Amount from its 'own account' " and payments made by Arena Group's other insurers to the injured parties did not satisfy the SIR.  Id.

The language of the insurance policy in Forecast Homes was even more explicit, expressly limiting who could satisfy the SIR.  The SIR endorsement required that the named insured "make actual payment" of the SIR amount and provided that "[p]ayments by others, including but not limited to additional insureds or insurers, do not serve to satisfy the self-insured retention."  Forecast Homes, 105 Cal. Rptr. 3d at 208.  The court found that "[t]his section of the policy regarding who can make the payment to satisfy the SIR is clear and unambiguous."  Id.

Acceptance Insurance involved a number of underlying actions for construction defects and property damage in homes based on work performed by a developer of residential real estate and the developer's subcontractors.  2002 WL 32515066 at *1.  The developer had a number of insurance contracts, including two with Insurance Company of the State of Pennsylvania (ISOP) and a comprehensive general liability policy with North American Capacity Insurance Company (NACIC).  Id.  Pursuant to its contracts, ISOP expended substantial funds in defending the underlying actions and making settlement payments.  ISOP sought indemnification from NACIC for a portion of the expenditures.  Id.  The NACIC policy included a $250,000 per occurrence SIR endorsement.  NACIC

argued that the SIR had not been satisfied because the developer did not pay any portion of its defense or settlement costs.  Id. at *2.  Those costs were paid by ISOP and other insurance companies not parties to the action between ISOP and NACIC.  Thus, the issue to be resolved was whether the NACIC insurance contract required the developer to fund the SIR itself.

The court determined that the SIR provision "clearly and unambiguously" required the developer to be responsible for satisfying the SIR with its own funds, regardless of any insurance coverage applicable to the underlying actions.  Id. at *7.  The SIR contained a provision stating that regardless of other insurance, the insured would continue to be responsible for the full SIR before the limits of insurance under the NACIC policy would apply.  Id.  The court noted that this provision in the SIR endorsement would be meaningless if not interpreted as requiring the insured to satisfy the SIR with its own funds.  Id.  Otherwise, the provision "would be reduced to simply reiterating the more general terms" of the policy.  Id.  Additionally, the endorsement expressly stated that it changed the policy and that it controlled in the event of a conflict with other policy provisions. Id. at *6.  The court explained that the SIR endorsement in the NACIC policy "clearly place[d] the insured on notice that the additional provisions of the Endorsement change[d] the general policy terms and conditions and [were] separate requirements."  Id.

We agree with the Eleventh Circuit that the policies at issue in the California cases are materially different from the instant policy. See Intervest Constr., 662 F.3d at 1330. While the SIR endorsement in the instant case contains the same notice of change to the policy that the SIR endorsement in Acceptance Insurance contained, it does not contain a provision addressing other insurance within the context of the SIR. The policy in Acceptance Insurance contained a provision expressly stating that regardless of other insurance the insured would continue to be responsible for the full SIR before the limits of the policy applied. Acceptance Ins., 2002 WL 32515066 at *7. The SIR endorsement in the Forecast Homes policy required the named insured to "make actual payment" of the SIR amount and expressly provided that "[p]ayments by others, including but not limited to additional insureds or insurers, do not serve to satisfy the self-insured retention." Forecast Homes, 105 Cal. Rptr. 3d at 208. There is no similar language or provision in the instant case.

The Eleventh Circuit also noted that the language of the instant policy "is arguably less restrictive than the language of the policies at issue in [the California] cases." Intervest Constr., 662 F.3d at 1330. For example, in Arena Group, the "other insurance" provision required the insured to pay all amounts within the retained amount "from its own account" and was also stated prominently on the first page of the policy—"The Retained Amount is the responsibility of the Insured

- 17 -

and is to be paid from the Insured's own account." Arena Group, 2007 WL 935611 at *5. The Arena Group policy clearly and unambiguously informed the insured that the retained amount had to be paid from its own funds. The language of the instant policy states that the retained limit must be paid by the insured, but does not specify where those funds must originate. Requiring payment to be made from the insured's "own account" is not necessarily the same as requiring that it be paid "by you."

Moreover, as the Eleventh Circuit noted in its opinion, "a strong argument could be made that ICI exhausted its SIR because it paid for the protection afforded in the indemnification clause." Intervest Constr., 662 F.3d at 1330. The contract between Custom Cutting and ICI, which included the right to indemnification, was entered into six years before the General Fidelity policy was purchased by ICI. ICI paid for the indemnity protection in the purchase price of the Custom Cutting subcontract and therefore hedged its retained risk in this manner. ICI bargained for and paid for this right to indemnification and, without an express policy provision to the contrary, should be able to use it to satisfy the SIR. The instant case is more akin to the policy in Vons, in which the SIR did not "expressly state that Vons itself, not other insurers, must pay the SIR amount." Vons, 92 Cal. Rptr. 2d at 605.

In light of the language of the policy and the right to indemnification for which ICI paid, we answer the first certified question in the affirmative and find that the General Fidelity policy allows the insured to apply indemnification payments received from a third party toward satisfaction of its $1 million self-insured retention.

The second certified question asks whether the common law rule of the "made whole doctrine" applies here or whether the transfer of rights clause in the policy abrogated the doctrine. The district court did not address this issue. However, the Eleventh Circuit considered the effect of the transfer of rights clause if ICI was permitted to use the Custom Cutting indemnification to satisfy the SIR obligation. See Intervest Constr., 662 F.3d at 1331. As the Eleventh Circuit explained, that right alone "would be of little value if the General Fidelity Policy gave General Fidelity the priority to be made whole before ICI could use any of the indemnity payment towards the SIR." Id. at 1331 n.6.

The text of the transfer of rights provision is found in SECTION IV—COMMERCIAL GENERAL LIABILITY LIMITS, and provides in full:

> 8. Transfer Of Rights Of Recovery Against Others To Us
>
> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring 'suit' or transfer those rights to us and help us enforce them.

- 19 -

As the Eleventh Circuit stated, the language of this provision is clear—it gives the insurer General Fidelity subrogation rights. However, the provision gives no guidance as to the priority to recover when the indemnity amount is insufficient to "make whole" both parties. See Intervest Constr., 662 F.3d at 1331. In its appeal to the Eleventh Circuit, ICI made two arguments regarding why the transfer of rights provision did not affect its priority to the indemnification funds. First, the plain language of the provision allows General Fidelity to recover only for payments "we have made," and, at the time ICI received the indemnification payment from Custom Cutting, General Fidelity had not yet made any payment. Second, even if the court disregards the tense of the language, the General Fidelity policy did not abrogate the "made whole doctrine" and thus ICI has priority to receive any indemnification before General Fidelity. Id. In turn, General Fidelity argued that the court cannot place excessive emphasis on the tense of the language, and further that the transfer of rights provision in the policy abrogated the common law rule of the "made whole doctrine" by writing into the policy priority rights for General Fidelity. Id.

"Subrogation is the substitution of one person in the place of another with reference to a lawful claim or right." W. Am. Ins. Co. v. Yellow Cab Co. of Orlando, Inc., 495 So. 2d 204, 206 (Fla. 5th DCA 1986) (quoting Boley v. Daniel, 72 So. 644, 645 (Fla. 1916)). Florida recognizes two types of subrogation:

conventional subrogation and equitable or legal subrogation. Conventional subrogation arises or flows from a contract between the parties establishing an agreement that the party paying the debt will have the rights and remedies of the original creditor. See Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 646 (Fla. 1999). Since subrogation is an offspring of equity, equitable principles apply, even when the subrogation is based on contract, except as modified by specific provisions in the contract. In the absence of express terms to the contrary, the insured is entitled to be made whole before the insurer may recover any portion of the recovery from a tortfeasor. See Fla. Farm Bureau Ins. Co. v. Martin, 377 So. 2d 827, 830 (Fla. 1st DCA 1979).

The "made whole doctrine" provides, absent a controlling contractual provision that states otherwise, that the insured has priority over the insurer to recover its damages when there is a limited amount of indemnification available. See Schonau v. GEICO Gen. Ins. Co., 903 So. 2d 285, 287 (Fla. 4th DCA 2005) ("Decisions applying the 'made whole' doctrine essentially hold that where both the insurer and the insured simultaneously attempt to recover all of their damages from a tortfeasor who cannot (because of insolvency, limited insurance coverage, or other reasons) pay the full value of damages, the insured has priority of recovery over the insurer."). Martin and the subsequent cases involving the "made whole doctrine" all deal with the insured's primary right to recover before the insurance

carrier.  See, e.g., Monte de Oca v. State Farm Fire & Cas. Co., 897 So. 2d 471 (Fla. 3d DCA 2004); Centex-Rodgers Constr. Co. v. Herrera, 761 So. 2d 1215 (Fla. 4th DCA 2000); Humana Health Plans v. Lawton, 675 So. 2d 1382 (Fla. 5th DCA 1996).  We have acknowledged the application of the made whole doctrine in Florida.  See Ins. Co. of N. Am. v. Lexow, 602 So. 2d 528, 529-30 (Fla. 1992) ("Using the common law subrogation principle, endorsed by Florida courts, the district court reasoned that the insured was entitled to be made whole before the subrogated insurer could participate in the recovery from a tortfeasor.").

ICI cites a Washington case for the proposition that the specific language of the transfer of rights provision found in the General Fidelity policy does not write out the "made whole doctrine," thereby preserving ICI's right of priority.  See Bordeaux, Inc. v. Am. Safety Ins. Co., 186 P.3d 1188, 1192-93 (Wash. Ct. App. 2008) (holding that "[t]he trial court properly ruled that [the insureds] were entitled to be made whole before any third-party recovery funds are paid to the insurers"). General Fidelity argues that Bordeaux is not on point.

Bordeaux addressed the nature of SIR provisions in commercial general liability policies that American Safety Insurance Company (American Safety) issued to the condominium developer, Bordeaux, Inc.  When the condominium association filed a lawsuit against Bordeaux alleging extensive construction defects and property damage relating to the condominiums, Bordeaux tendered its defense

to its two insurers, American Safety and Steadfast Insurance.  Id. at 1189.  The American Safety policy contained a SIR provision that obligated Bordeaux to pay $100,000 before American Safety had an obligation to provide indemnity, coverage, or defense under the policy.  Id.  The policy also contained a subrogation provision which stated that "[i]f the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us."  The policy defined the word "we" as "American Safety."  Id. at 1190.  The Washington court determined that "the subrogation provision clearly only allows American Safety to recover payments it actually made."  Id. at 1192 (emphasis added).  Additionally, despite the subrogation provision in the policy, the court concluded that the "made whole doctrine"[3] applied in the case and affirmed the trial court's ruling that the insureds "were entitled to be made whole before any third-party recovery funds are paid to the insurers."  Id. at 1192-93.

Bordeaux cited two Florida cases in support of its conclusion that the SIR did not operate as primary insurance, thereby making American Safety's policy provide excess insurance.  This conclusion was significant because had the self-insurance provisions constituted insurance and American Safety's policy been

---

3.  The court did not use the term "made whole doctrine," instead referring to the "long-standing rule . . . favoring full compensation of insureds over subrogation rights of insurers."  Bordeaux, 186 P.3d at 1192.  This clearly is the same as the "made whole doctrine" under Florida law.

deemed "excess" insurance, then American Safety's rights to subrogation would have been superior to Bordeaux's, and American Safety would have been entitled to recover third-party settlement funds before its insured.[4] The Bordeaux court cited the Fourth District Court of Appeal's decision in Zinke-Smith, Inc. v. Florida Insurance Guaranty Ass'n, 304 So. 2d 507, 509 (Fla. 4th DCA 1974), and this Court's decision in Young v. Progressive Southeastern Insurance Co., 753 So. 2d 80, 85-86 (Fla. 2000), for the proposition that self-insurance does not constitute insurance. Both parties make much of the fact that Florida cases were cited in Bordeaux. ICI cites this as evidence that Washington law is similar to Florida's. However, General Fidelity correctly notes that the Florida cases cited turned on a different point of law. Zinke-Smith is based on statutory construction, not on interpretation of policy language. The Fourth District held that an employer who secures worker's compensation as a self-insurer does not become an insurer under the insurance code. In Young, this Court dealt with the meaning of "insurance" in the Uninsured Motorists Statute, holding that a self-insured party is not insured. Young did not involve interpretation of policy terms at all, only statutory interpretation.

However, the language of the transfer of rights clause in the instant case is exactly the same as that in Bordeaux. While Bordeaux is not controlling precedent

_____

4. General Fidelity did not make that argument in this case.

in this case, it is persuasive authority that the "made whole doctrine" is still applicable despite the insurance subrogation provision. As Florida law explains, because subrogation is an offspring of equity, equitable principles (such as the "made whole doctrine") apply even when the subrogation is based on contract, unless the contract contains express terms to the contrary. See Fla. Farm Bureau, 377 So. 2d at 830. Here, the transfer of rights clause does not address the priority of reimbursement nor does the clause provide that it abrogates the "made whole doctrine." In the absence of such express language, equitable principles prevail. Thus, we answer the second certified question by stating that the transfer of rights provision in the policy does not abrogate the made whole doctrine, thereby preserving ICI's right of priority.

## CONCLUSION

Accordingly, we answer the Eleventh Circuit's first certified question in the affirmative and the second certified question by concluding that the transfer of rights provision in the policy does not abrogate the made whole doctrine. Having answered the certified questions, we return this case to the United States Court of Appeals for the Eleventh Circuit.

It is so ordered.

PARIENTE, LEWIS, LABARGA, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion in which POLSTON, C.J., concurs.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Based on the unambiguous allocation of risk under the provisions of the policy, I would conclude that indemnification payments received from a third party may not be applied to satisfy the self-insured retention. I thus would answer the first certified question in the negative. That negative answer to the first question renders the second certified question moot.

Paragraph 3 of the self-insured retention endorsement plainly states that the insurer has "no duty to defend or indemnify unless and until the amount of the 'Retained Limit' is exhausted by payment of settlements, judgments, or 'Claims Expense' <u>by you</u>"—that is, by the insured. Paragraph 6 of the endorsement plainly states that "the 'Retained Limit' will <u>only</u> be reduced by payments made <u>by the insured</u>." No other provisions of the policy render these provisions ambiguous.

A payment made by a third party pursuant to an indemnification agreement is not a payment "made by the insured." The insurance policy should not be rewritten to allow satisfaction of the self-insured retention limit in a manner other than the manner specifically provided for in the policy. I thus would reject the legal fiction adopted by the majority that a payment made by a third party pursuant to a contractual indemnity provision is a payment "made by the insured."

Imposing that legal fiction effectively reads the phrase "by you" out of paragraph 3. And it reads the entirety of paragraph 6 out of the endorsement. The majority's unjustified interpretation of the endorsement gives the endorsement a meaning that is no different than if those provisions were absent from the policy.

I dissent.

POLSTON, C.J., concurs.

Certified Question of Law from the United States Court of Appeals for the Eleventh Circuit - Case No. 10-12613-GG

W. Braxton Gilliam, IV and Robert M. Dees of Milam Howard Nicandri Dees & Gilliam, P.A., Jacksonville, Florida,

for Appellants

Louis Schulman of Dutton Law Group, P.A., Tampa, Florida,

for Appellee